# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | | |
|---|---|---|
| Madison Capital Company, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:08-CV-1563-PMD |
| v. | ) | |
| | ) | |
| Joseph H. Miller, IV, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This matter is before the court upon Plaintiff Madison Capital Company, LLC's ("Plaintiff") Motion for Summary Judgment as to claims made by it against Defendant Joseph H. Miller, IV for breach of contract. For the reasons set forth below, the court grants Plaintiff's Motion for Summary Judgment.

## BACKGROUND

Defendant Joseph Miller ("Miller"), a real estate developer with experience as an owner and operator of marinas, is the manager of The Harborage Club - Fort Lauderdale, LLC ("The Harborage Club"), as well as the manager and sole member of AMH - Fort Lauderdale, LLC which is the sole member of the Harborage Club. The Harborage Club sought to develop The Harborage Club & Marina in Fort Lauderdale, Florida as a luxury condominium and dry-stack boat marina. To do so, Miller, acting on behalf of Harborage Club, entered into a Loan Agreement with Plaintiff, a commercial mortgage lender, on June 29, 2007 to secure $23.9 million in financing for the purchase and initial development of the marina project. Plaintiff and The Harborage Club engaged in negotiations for several months before they finalized this deal;

they exchanged numerous drafts and made multiple revisions to the deal documents. During these negotiations, both parties were represented by counsel.

In connection with the Loan Agreement, Miller executed a Guaranty of Payment with Plaintiff by which Miller personally guaranteed up to $1.6 million of the $23.9 million loan amount. Under the Guaranty, Miller specifically agreed to "absolutely, unconditionally, irrevocably and personally guarantee the payment of the Guaranteed Portion of the Debt." (Pl. Mot. for Summ. J. Ex. D. at ¶ 1.) The Guaranty defined the term "Guaranteed Portion of the Debt" as "(i) a portion of the entire outstanding amount of the Debt equal to $1,600,000.00 whenever the entire outstanding amount of the Debt is in excess of $1,600,000.00 or (ii) the entire outstanding amount of the Debt whenever the outstanding amount of the Debt is equal or less than $1,600,000.00." (*Id.*) Under the Guaranty, Miller also waived his right to assert affirmative defenses and counterclaims:

> Guarantor further covenants and agrees not to set up or claim any defense, counterclaim, cross-claim, offset, set-off, right of recoupment, or other objection of any kind to any action, suit or proceeding in law, equity or otherwise, or to any demand or claim that may be instituted or made by Lender hereunder other than the defense of the actual timely performance of Guarantor's Obligations hereunder.

(*Id.* at ¶ 4.) The Guaranty also states as follows:

> Guarantor acknowledges that this Guaranty and Guarantor's Obligations are and shall at all times continue to be absolute, unconditional and irrevocable in all respects, and shall at all times be valid and enforceable irrespective of any other agreement or circumstances of any nature whatsoever that might otherwise constitute a defense to this Guaranty or the obligations of any other person or party (including, without limitation, Borrower or any other guarantor) relating to this Guaranty or the obligations of Guarantor hereunder.

(*Id.* at ¶ 8.)

Plaintiff contends that The Harborage Club defaulted on its obligations under the Loan

Agreement, and as a result it demands Miller pay pursuant to the Guaranty. To date, Miller has failed to pay any amount due. Plaintiff has filed an action in Florida to foreclose on the marina project due to The Harborage Club's failure to make the payments required under the Loan Agreement, and it has also filed the suit before this court against Miller, alleging one cause of action to enforce and collect on the Guaranty. In response to Plaintiff's Complaint, Miller filed and Answer and Counterclaim, asserting nine affirmative defense and three counterclaims. Currently before the court are Plaintiff Madison Capital Company, LLC's Motion for Summary Judgment and Motion to Strike Miller's Request for a Jury Trial.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*,

48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327.

## **ANALYSIS**

Both the Loan Agreement and the Guaranty contain a choice of law provision stating that New York law is to apply. (Pl. Mot. for Summ. J. Ex. B. at ¶ 10.3; Ex. D. at ¶ 24.) Therefore, the court analyzes Plaintiff's Motion for Summary Judgment in accordance with that state's legal principles. Before addressing the merits of Plaintiff's motion, the court first addresses several arguments made by Miller to defeat Plaintiff's motion concerning collateral matters.

### I. **Miller's Election of Remedy Argument**

Plaintiff has filed a foreclosure action against The Harborage Club in Florida, and Miller contends that New York law precludes it from proceeding in the foreclosure action while prosecuting this action against him on the Guaranty in South Carolina. Miller argues that proceeding in this manner is a waste of judicial resources and facilitates an improper double recovery. To support his argument, Miller cites to *Mfrs. Hanover Trust Co. v. 400 Garden City Assoc.*, in which a plaintiff, the holder of two mortgages and a guaranty executed by the defendants to secure payment for loans used to obtain property in the state of New York, sought the court's leave to pursue a legal action against the defendant-guarantor of a mortgage while also proceeding in an equitable foreclosure action against the defendant-mortgagor. In denying the plaintiff's motion, the court recited New York's law on the matter: "In New York, where a mortgagor defaults, a mortgagee must elect between pursuing a legal remedy or foreclosing on

the property, but may not prosecute both actions without leave of court. . . . This 'election of remedies' rule applies to actions on the guarantee of a note." 568 N.Y.S.2d 505, 507 (N.Y. Sup. Ct. 1991) (citing N.Y. Real Prop Acts Law § 1301(3) ("While the action [to collect a mortgage debt] is pending or after final judgment for the plaintiff therein, no other action shall be commenced or maintained to recovery any part of the mortgage debt, without leave of the court in which the former action was brought.").

Miller relies on this law to request that Plaintiff elect its remedy in this action, assuming the Harborage Club defaulted on the Loan. Unlike in *Manufacturers Hanover Trust Co.*, where the property at issue was located in New York, the property at issue in this case is located in Florida, and New York courts have long decided that section 1301(3) of the RPAPL has "no application—and [thus] no election of remedies need be made—where the indebtedness is secured by a mortgage on real property located outside of the state." *See, e.g.*, *Wells Fargo Bank Minn. V. Cohn*, 2003 N.Y. Misc. Lexis 2006, at *6 (Sup. Ct. July 23, 2003) (citing numerous cases). Since the real property in this case is located in Florida and not in New York, the court finds that RPALP § 1301(3) does not bar Plaintiff's action for breach of guaranty.[1]

## II. Miller's Argument that Summary Judgment is Premature

Also in response to Plaintiff's Motion for Summary Judgment, Miller contends that Plaintiff's motion is premature pursuant to Federal Rule of Civil Procedure 56(f) because it has failed to produce the following documents in discovery as requested: (1) a presentation made by Brett Ellen, a vice president of Plaintiff, to its investment committee; (2) a term sheet showing

---

[1] Plaintiff concedes that it is not entitled to a double recovery and will reduce any amounts sought from The Harborage Club if its action against Defendant is successful.

5

the original terms proposed to Miller; and (3) models indicative of Plaintiff's intent to acquire Miller's property through foreclosure and realize the gains of the project without Miller's involvement. (Def. Mem. in Opp. at 8.) In its Reply Memorandum, Plaintiff contends that it has produced all presentations made to the investment committee, all models made prior to the loan transaction, and the term sheet, as well as several draft term sheets. Plaintiff provided the document identification number for all of these documents. Since it appears Plaintiff has satisfied Miller's discovery request, the court will not deny Plaintiff's Motion for Summary Judgment on this ground.

### III. Plaintiff's Action for Breach of Guaranty

Plaintiff contends it is entitled to judgment as a matter of law on its breach of guaranty claim. Under New York law, a plaintiff who has filed an action on a guaranty is entitled to judgment as a matter of law if it proves (1) the existence of an underlying obligation, (2) that the defendant undertook a guaranty of the underlying obligation, (3) default on the underlying obligation and (4) default under the guaranty. *Suffolk County Nat'l Bank v. Columbia Telecomms. Group, Inc.*, 832 N.Y.S.2d 80, 81 (N.Y. App. Div. 2007); *E.D.S. Sec. Sys., Inc. v. Allyn*, 691 N.Y.S.2d 567, 567 (N.Y. App. Div. 1999). The parties do not dispute the existence of both the Loan Agreement and the Guaranty of Payment in this case. The parties do disagree as to whether The Harborage Club defaulted under the terms of the Loan Agreement, as Miller contends that a genuine issue of material fact exists as to whether the underlying debt was in default.

Under the Loan Agreement, an "Event of Default" existed "if any portion of the Debt is not paid when due." (Pl. Mot. for Summ. J. Ex. B. at ¶ 8.1(i).) The Loan Agreement defined

"Debt" as follows:

> "**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note (including all Accrued Interest added to the principal amount of the Note pursuant to Section 2.3.2 of this Agreement), together with all interest accrued and unpaid thereon, Additional Interest and all other sums (including the Minimum Multiple, if any) due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage or any other Loan Document.

(*Id.* § 1.1.) The Loan Agreement required the Harborage Club to make a mandatory prepayment of $19,950,000.00 on December 31, 2007, six months after entering into the Loan Agreement, and this sum constituted Debt as that term is defined. (*Id.* § 2.4.2.) Under the Loan Agreement, however, The Harborage Club had the right to extend this first prepayment date by providing written notice to Plaintiff of its desire to extend the date as well as paying Plaintiff an extension fee in the amount of 2% of the outstanding principal amount of the Loan. (*Id.*) Plaintiff contends that The Harborage Club failed to make the mandatory prepayment on December 31, 2007 and that Miller admitted this in the following deposition testimony:

> Q. [Y]ou never made a prepayment of $19,950,000 on or before December 31 of 2007; that's correct, am I right?
>
> A. Yes, sir.

(Miller Dep. 55:4–7.) As for requesting an extension of time to pay the mandatory prepayment, Miller also admitted that the Harborage Club did not properly exercise the option to extend the mandatory prepayment deadline:

> Q. You never requested the first extension in writing and sent by the methods that I just read out loud here from Section 10.6, did you?
>
> A. No sir.
>
>     . . . .

> Q. December 31, 2007, that following Monday, came and went, and you neither paid the $19,500,000 mandatory prepayment, nor the $450,909 extension fee payment by that date; am I right?
>
> A. That's correct. I was trying to, but no, I did not.

(*Id.* 57:7–10; 64:5-10.) Based on the terms of the Loan Agreement and Miller's deposition testimony that The Harborage Club never exercised its optional extension, the court finds that The Harborage Club entered into an Event of Default when it failed to make the mandatory prepayment of $19,950,000 due on December 31, 2007.

Despite these facts, Miller contends that a genuine issue of material fact exists as to whether The Harborage Club defaulted under the Loan Agreement. First, Miller contends an "Event of Default" does not occur until a 10-day right to cure is provided by Plaintiff and that Plaintiff never provided The Harborage Club with that opportunity to cure. As already discussed above, section 8.1(i) of the Loan Agreement defines one Event of Default as when "any portion of the Debt is not paid when due." (Pl. Mot. for Summ. J. Ex. B. at § 8.1(i).) Miller argues that the Loan Agreement also provided:

> if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xii) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days.

(*Id.* § 8.1(xiv)) (emphasis in original). Besides referencing the provision, Miller does not explain how this provision affords him a 10-day right to cure. As previously discussed, the mandatory

prepayment constituted "Debt" under the Loan Agreement, and The Harborage Club defaulted under the Loan Agreement when it failed to make this payment when due. Since this event of default is outlined in the Loan Agreement at § 8.1(i), it does not qualify for a 10-day right to cure under § 8.1(xiv), as that provision specifically provides for a right to cure only when events of default are not triggered by "subsections (i) to (xii) above." (*Id.* § 8.1(xiv)) (emphasis in original). Thus, the court finds that The Harborage Club did not have a 10-day right to cure the December 31, 2007 mandatory prepayment.

Instead, The Harborage Club had the right to extend the deadline to make its prepayment in accordance with section 2.4.2 of the Loan Agreement, which provides in relevant part:

> Notwithstanding the foregoing, Borrower shall have the right, upon prior written notice to Lender, to extend the [first mandatory prepayment date] to the earlier to occur of (i) the date of closing of the Construction Loan or (ii) nine (9) months after the Closing Date, provided that Borrower pays to Lender at the time of delivery of such extension notice an extension fee equal to two percent (2%) of the outstanding principal amount of the Loan.

(*Id.* § 2.4.2.) Miller contends that on January 10, 2008, he met with Andy Kaye, a Senior Advisor for Plaintiff, and tendered payment on behalf of The Harborage Club for its right to extend the mandatory prepayment date. Miller claims that Kaye refused to accept the tender. (Mem. in Opp. at 6.) In his deposition, Miller testified, "I had a right to cure under the Loan Agreement, which I offered to do in person with Andy Kay three times in New York witnessed by three other individuals." (Miller Dep. 90:5–8.) Plaintiff argues that Miller never made such a tender, and even if he did, it would not be valid because the offer of payment was not accompanied with the extension fee. Besides his own testimony, Miller has not provided any evidence to show that he actually tendered the extension fee with his request. *See MacKenzie v. MacKenzie*, 841 N.Y.S.2d 433, 436 (N.Y. Sup. Ct. 2007) ("[A] valid tender requires not only readiness and ability to

perform, but actual production of the thing to be delivered.") (citation omitted). Apart from The Harborage Club's failure to properly exercise its deadline extension option, The Harborage Club also failed to timely exercise its extension option. It owed its first mandatory prepayment under the Loan Agreement on December 31, 2007, and if it desired to extend that deadline, it needed to provide "*prior* written notice" and an "extension fee" to Plaintiff. Since no dispute exists over the fact that the Harborage Club did not allegedly exercise its extension option until January 10, 2008, the court finds that Miller cannot defeat Plaintiff's Motion for Summary Judgment by arguing that it exercised its option to extend the mandatory prepayment deadline after the deadline had passed. To the extent Miller attempts to characterize The Harborage Club's failure to pay the extension fee as an Event of Default subject to a 10-day right to cure, the court disagrees. The Harborage Club was not obligated under the Loan Agreement to pay the extension fee; rather it was an option that it could exercise at its discretion. Moreover, even if the court assumed that an Event of Default occurred when The Harborage Club failed to exercise its option to extend the prepayment deadline, there would be no right to cure. Since the failure to pay the extension fee would presumably be included as an Event of Default under section 8.1(i) for failure to pay any portion of the Debt when due, section 8.1(xiv) of the Loan Agreement, as discussed above, does not give a 10-day right to cure for events of default under Section 8.1(i).

Finally, Miller contends that Plaintiff's Motion for Summary Judgment should be denied because it failed to make a second advance borrowing of $3,550,000 ("Second Advance") to The Harborage Club as it was obligated to do under the Loan Agreement. Miller asserts that The Harborage Club proposed to use a portion of this Second Advance to pay the extension fee necessary to extend the deadline to pay the mandatory prepayment. The pertinent provision in

the Loan Agreement states:

> Borrower may request and receive only two (2) borrowings hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the loan may not be reborrowed. On the date hereof, Lender has advanced to Borrower the sum of Twenty Million Three Hundred Fifty Thousand and 00/100 Dollars ($20,350,000.00). At such time as either a final non-appealable judgment is rendered dismissing the Mark I Litigation or a settlement agreement in form reasonably satisfactory to Lender is entered into by all necessary parties resulting in the dismissal with prejudice of the Mark I Litigation, and provided no Event of Default exists, at the request of Borrower Lender shall advance the sum of Three Million Five Hundred Fifty Thousand and 00/100 Dollars ($3,550,000.00) (the "**Second Advance**"). Notwithstanding the foregoing, Lender shall not be obligated to advance any portion of the Loan after June 30, 2008.

(Pl. Mot. for Summ. J. Ex. B. at § 2.1.2) (emphasis in original). Defendant argues that the Second Advance was triggered, but Plaintiff did not pay it; therefore, it should not be entitled to summary judgment. To show that The Harborage Club was entitled to the second advance prior to the mandatory prepayment deadline, Miller must show that it entered into "a settlement agreement in a form reasonably satisfactory to Lender [that resulted] in the dismissal with prejudice of the Mark I Litigation, and (2) that no Event of Default existed at the time it entered into this settlement agreement. The Mark I Litigation was an action commenced in Florida by a neighboring condominium association that opposed The Harborage Club's marina project and sought to have the project's entitlements rescinded.

Miller contends that the parties of the Mark I Litigation orally agreed to settle their dispute for $100,000 in late November 2007. Plaintiff argues that the Mark I Litigation was still pending on December 31, 2007, thus preventing Plaintiff from making the Second Advance to The Harborage Club under the Loan Agreement. To support its assertion, Plaintiff cites to an e-mail sent by Miller to Plaintiff on January 7, 2008, acknowledging that the Mark I Litigation had not been settled and that he was offering to pay an additional $25,000 to settle it:

11

> [A]s far as the settlement, mark I's board is meeting tonight - I have not been bothering you day to day with the excruciating process of dealing with these idiots – jim carroll and I are so frustrated we don't know what to do – while they had originally agreed to the settlement concept, apparently they may not have had board approval or the board may not have approved of the document form – we can't tell – the good news is that we are dealing with a different lawyer – to give them some incentive I raised the ante $25k – I know that makes no sense but I was trying to get some movement – keep your fingers crossed.

(Pl. Reply Mem. Ex. C.) Later that day, Miller e-mailed Plaintiff to inform them that he thought a settlement had been reached for the Mark I Litigation:

> Good news – just heard back from jim – the other lawyer says we have a deal at $150k and that we will have a signed document today – I am assuming this means we have authorization to proceed and the $75k the project would owe would be covered (plus ½ of jim/nancy's fees – think balance to close out would be around $22k) – sundance would obviously still owe the other $75k plus half of these attorneys fees – please confirm that my assumption is correct – if this is indeed the case I will sign the settlement document on behalf of the LLC as drafted and last approved by Madison

(*Id.* Ex. D.) It appears that it was not until January 9, 2008 that the Mark I Litigation finally settled, as evidenced by an e-mail sent by Miller to Plaintiff:

> Small miracles!!! The signed release is attached. I will need your authorization to sign on behalf of the project. The Release requires that The Harborage Club and AMH pay the sum of $155,000 to settle the lawsuit. One-half of this amount will be reimbursed by Sundance. . . . Before signing we obviously need assurance that Madison will fund the settlement amount and the associated attorneys' fees from the Litigation Reserve Fund described in the Loan Agreement, notwithstanding any existing claim of a borrower default pursuant to the loan documents. The settlement payment would be due once we receive notice of dismissal. Please authorize execution and confirm funding for me so I can get an executed copy back in Jim Carroll's hands asap.

(*Id.* Ex. E.) Plaintiff provided a copy of the final Mutual General Release Agreement that finally settled the Mark I Litigation, and it was signed by Miller on January 9, 2008. Contrary to Miller's contention that the Mark I Litigation settled in late November 2007, the parties did not finalize a settlement until January 9, 2008. In his deposition, Miller gave the following

12

testimony:

> The settlement was verbally made in late November. We tweaked some terms throughout early December, which Madison agreed to in writing. The only thing that changed was to get [the Mark I litigants] to confirm it in writing [and] pay them another 25 grand, which isn't real material in light of this project.

(Miller Dep. 81:7–12.) Based on the foregoing e-mails and testimony, the court finds that the Mark I Litigation was not settled prior to December 31, 2008; therefore, Plaintiff did not have to provide The Harborage Club with the Second Advance under the Loan Agreement, assuming that it was properly requested,[2] before its mandatory prepayment became due.

Since Miller undertook a guaranty of The Harborage Club's underlying obligation to Plaintiff, on which it defaulted, the court finds that Plaintiff is entitled to judgment as a matter of law for its breach of guaranty claim asserted against Miller. *Columbia Hosp. v. Hraska*, 338 N.Y.S.2d 527, 529 (Civ. Ct. 1972) ("A guaranty is dependent upon the existence of a separate and independent contract or agreement, and a guarantor's obligation matures when there is a default on the separate and independent contract or agreement."). Although Miller contends that a genuine issue of material fact exists as to the amount owed under the personal guaranty, the court disagrees. Miller contends that since Plaintiff has retained an origination fee paid by The Harborage Club under the loan agreement, since Plaintiff has retained several accounts which contain proceeds of the marina project realized by The Harborage Club prior to this litigation, and since The Harborage Club had $4.1 million in equity in the project, an issue of fact exists as

---

[2] The Loan Agreement requires that "[a]ll notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing." (Pl. Mot. for Summ. J. Ex. B. at § 10.6.) Plaintiff contends that The Harborage Club never requested the Second Advance in writing, as required under the Loan Agreement, and in his deposition, Miller testified that he did not send a request for the Second Advance using any of the methods provided in section 10.6 of the agreement. (Miller Dep. 71:19–23.)

13

to what Miller owes under the Guaranty, if anything at all. The court disagrees. These claims for a set off belong to The Harborage Club, who is not a party to this action, and the Guaranty plainly defined the term "Guaranteed Portion of the Debt" as "(i) a portion of the entire outstanding amount of the Debt equal to $1,600,00.00 whenever the entire outstanding amount of the Debt is in excess of $1,600,000.00 or (ii) the entire outstanding amount of the Debt whenever the outstanding amount of the Debt is equal or less than $1,600,000.00." (*Id.*) Based on the record before the court, the outstanding amount of Debt owed by The Harborage Club to Plaintiff is in excess of $1.6 million; therefore, the court finds that Miller agreed to pay $1.6 million under the Guaranty.

### IV. Plaintiff's Motion for Summary Judgment as to Miller's Affirmative Defenses and Counterclaims

Plaintiff also moves for judgment as a matter of law as to all of the affirmative defenses and counterclaims asserted by Miller, arguing that Miller expressly agreed not to assert any defense or counterclaim other than the defense of timely performance under the Guaranty. Paragraph four of the Guaranty provides in relevant part:

> Guarantor further covenants and agrees not to set up or claim any defense, counterclaim, cross-claim, offset, set-off, right of recoupment, or other objection of any kind to any action, suit or proceeding in law, equity or otherwise, or to any demand or claim that may be instituted or made by Lender hereunder.

(Pl. Mot. for Summ. J. Ex. D. ¶ 4.) To support its motion, Plaintiff cites to *Citibank v. Plapinger*, in which the New York Court of Appeals held that a defense alleging fraudulent inducement of a guaranty was barred by the express terms of the guaranty, which stated that it was "absolute and unconditional" irrespective of any lack of validity or enforceability of the guarantee or any other

circumstance which might otherwise constitute a defense. 485 N.E.2d 974, 976–77 (N.Y. 1985).

In that case, the court explained:

> Here we do not have the generalized boilerplate exclusion referred to by the commentators. Rather, following extended negotiations between sophisticated business people, what has been hammered out is a multimillion dollar personal guarantee proclaimed by defendants to be 'absolute and unconditional.' It is unrealistic in such circumstances to expect an express stipulation that defendants were not relying on a separate oral agreement to fund an additional multimillion dollar line of credit, when they themselves have denominated their obligation unconditional, and have reinforced that declaration by their agreement that the 'absolute and unconditional' nature of their guarantee was 'irrespective of (i) any lack of validity [. . .] of the [. . .] Restated Loan Agreement [. . .] or any other agreement or instrument relating thereto', or '(vii) any other circumstance which might otherwise constitute a defense' to the guarantee.
>
> [T]he substance of defendants' guarantee forecloses their reliance on the claim that they were fraudulently induced to sign the guarantee by the banks' oral promise of an additional line of credit. To permit that would in effect condone defendants' own fraud in 'deliberately misrepresenting [their] true intention' when putting their signatures to their 'absolute and unconditional' guarantee.

*Id.* at 976–977. "Relying on *Citibank*, New York courts have consistently upheld broadly worded waiver language of this type to preclude the assertion of defenses to a guaranty." *Red Tulip, LLC v. Neiva*, 842 N.Y.S.2d 1, 5 (N.Y. App. Div. 2007) (finding that a defendant's defenses and counterclaims were barred by the provisions of a guaranty). In this case, the Guaranty signed by Miller also states:

> Guarantor acknowledges that this Guaranty and Guarantor's Obligations are and shall at all times continue to be *absolute, unconditional and irrevocable* in all respects, and shall at all times be valid and enforceable irrespective of any other agreement or circumstances of any nature whatsoever that might otherwise constitute a defense to this Guaranty or the obligations of any other person or party (including, without limitation, Borrower or any other guarantor) relating to this Guaranty or the obligations of Guarantor hereunder.

(Pl. Mot. for Summ. J. Ex. D. ¶ 8) (emphasis added). Additionally, the Guaranty and Loan Agreement were not products of boilerplate terms imposed by one party upon the other; rather,

15

they were agreed upon after lengthy negotiations between sophisticated parties who were represented by counsel. Therefore, the court finds that Plaintiff is entitled to judgment as a matter of law on Miller's defenses and counterclaims.

This finding includes Miller's claim that the court should void the Guaranty because he entered into the contract under economic duress. In addition to the waiver provision in the Guaranty, Miller waived this defense by not raising it in his Answer and Counterclaim. Rule 8(c) of the Federal Rules of Civil Procedure lists duress as an affirmative defense that must be affirmatively pled in a responsive pleading, and the Fourth Circuit has adopted the general rule that a defense is waived if it is not pled in a responsive pleading. *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 612 (4th Cir 1999). While the Fourth Circuit also recognizes an exception to this general rule of waiver—when the affirmative defense would not cause unfair surprise or prejudice to the opposing party—the court does not find that the exception applies in this instance. *Id.* This case has been pending since April 2008 and the parties have already engaged in written discovery and finished taking depositions. Therefore, even if Miller's duress claim survived the waiver provision of the Guaranty, the court finds that Plaintiff would be prejudiced if Miller could raise a defense based on duress at this time.

## V.     Miller's Equitable Arguments

Lastly, Miller argues that it would be inequitable for Plaintiff to pursue the action on the Guaranty because Plaintiff estimated a potential profit of $10 million upon completion of the marina project, that Plaintiff retained a $717,000 origination fee despite not paying the Second Advance, and that Plaintiff retained bank accounts containing all proceeds The Harborage Club earned from the project. The court disagrees.

### a. **Plaintiff's Estimated Profit**

Defendant contends that Plaintiff's breach of guaranty action should be equitably set aside because Plaintiff may recognize a $10 million profit from the marina project. To make this argument, Miller cites to the deposition testimony of Brett Ellen, a vice president of Plaintiff:

> Q. So internally you're still looking at this as one where you can make a profit?
>
> A. A small profit over a long period of time.
>
> Q. Certainly over $10 million by your analysis?
>
> A. Yeah, it depends on the carry after completion and that sort of thing.

(Ellen Dep. 88:1-10.) Later in his deposition, however, Ellen further testified the following:

> Q. Do you remember Mr. McCullough asked you whether in words or substance Madison thought that if this thing gets completely built out that Madison might make $10 million, do you remember that series of questions?
>
> A. Yes.
>
> Q. Could Madison also lose money after this gets built out?
>
> A. Yes.
>
> Q. Could it break even?
>
> A. Yes.
>
> Q. Do you know today which of those things is going to happen?
>
> A. I don't know.

(*Id.* 178:3–17.) As the record reflects, Plaintiff may realize a profit from this action, but may also lose money on the deal. If Plaintiff succeeds in its foreclosure action, it would assume the risk of the project as any other lender would who forecloses on property. This court is unwilling to set

aside this action simply because Plaintiff has the chance of realizing a profit on the project.

### b. **Origination Fee and Retained Accounts**

Defendant also contends that the guaranty action should be equitably set aside because Plaintiff retained a loan origination fee in the amount of $717,000.00 which related, in part, to the second advance that never materialized, as well as retained bank accounts containing all proceeds The Harborage Club earned from the marina project. The court finds these arguments without merit, as they are claims belonging to The Harborage Club, which is not a party to this action. Furthermore, Defendant cites no authority or language from the Loan Agreement to support his proposition that a borrower is entitled to a refund of an origination fee and accounts when part of the funding is not made as a result of the borrower's default. Thus, the court is unwilling to set aside Plaintiff's cause of action based on these equitable arguments.

### CONCLUSION

Based on the foregoing, the court **ORDERS** that Plaintiff Madison Capital Company, LLC's Motion for Summary Judgment is **GRANTED**, and its Motion to Strike Miller's Request for a Jury Trial is rendered **MOOT**. Under the Guaranty of Payment, Plaintiff is entitled to $1.6 million plus prejudgment interest from Miller.

_____
PATRICK MICHAEL DUFFY
United States District Judge

**September 22, 2009**
**Charleston, SC**